**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

THOMAS JEFFERSON MABRY III       )
LORETTA MABRY, POA,              )
                                 )
v.                               )       **No. 2:14-00097**
                                 )       **Judge Sharp/Brown**
CAROLYN W. COLVIN,               )
ACTING COMMISSIONER              )
OF SOCIAL SECURITY,              )

**To: The Honorable Kevin H. Sharp, Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the

final decision of the Social Security Administration (SSA) through its Commissioner, denying

plaintiff Thomas Jefferson Mabry III's applications for Disability Insurance Benefits (DIB) under

Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental

Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*.  For the reasons

explained below, the undersigned **RECOMMENDS** that plaintiff's amended motion for judgment

on the administrative record (Doc. 31) be **DENIED**, the Commissioner's decision **AFFIRMED**, and

plaintiff's original *pro se* motion for judgment on the administrative record (Doc. 18) be

**TERMINATED AS MOOT**.

## I.  PROCEDURAL HISTORY

Thomas Jefferson Mabry III (hereinafter "plaintiff"), filed for DIB and SSI on May 12, 2011

(Doc. 14, pp. 59, 103-06, 161-71),[1] alleging an initial disability onset date of April 23, 2006 (Doc.

14, pp. 173, 206).  Plaintiff claimed that he was unable to work because of a broken back and high

blood pressure.  (Doc. 14, pp. 118-19, 131-32)  His date last insured (DLI) was March 31, 2011.

---

[1] References to page numbers in the administrative record (Doc. 14) are to the page numbers that appear in
bold in the lower right corner of each page.

(Doc. 14, pp. 51, 136)

Plaintiff's applications were denied initially on May 23, 2011, and upon reconsideration on December 1, 2011. (Doc. 14, pp. 127-32) On January 25, 2012, plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 14, p. 133) A hearing was held in Cookeville on April 15, 2013 before ALJ Alfred Smith. (Doc. 14, pp. 66–102) Plaintiff was represented at the hearing by Donna Simpson, an attorney. (Doc. 14, pp. 66, 68, 71-91, 93, 100-01)

The ALJ entered an unfavorable decision on June 19, 2013 (Doc. 14, pp. 48-63), after which plaintiff filed a request with the Appeals Council on July 24, 2013 to review the ALJ's decision (Doc. 14, p. 47). The Appeals Council denied plaintiff's request on August 25, 2014 (Doc. 14, pp. 1-6), whereupon the ALJ's decision became the final decision of the Commissioner.

Counsel filed an amended motion for judgment on the administrative record on September 11, 2015 (Doc. 31),[2] the Commissioner responded on September 23, 2015 (Doc. 33), and plaintiff replied that same date (Doc. 34). This matter is now properly before the court.

## I. REVIEW OF THE RECORD

### A. Medical Evidence[3]

Plaintiff was treated at the Cumberland River Hospital emergency room (ER) on April 23, 2006 after an accident in which his 4-wheeler rolled on top of him. (Doc. 14, pp. 256-60) Xrays revealed lumbar compression fractures at T12 and L1 of "indeterminate" age, vertebral body

---

[2] Loretta Mabry, a non-attorney proceeding *pro se* and with power of attorney, brought the present action on plaintiff's behalf. (Doc. 1) Ms. Mabry filed a *pro se* motion for judgment on the administrative record on July 6, 2015. (Doc. 18) The Magistrate Judge entered an order on July 7, 2015 ruling that Ms. Mabry was not permitted to represent her husband because she was not an attorney. (Doc. 19) The Magistrate Judge granted Ms. Mabry's subsequent motion to appoint counsel (Doc. 25), and attorney Phillip George accepted appointment (Doc. 27).

[3] The excerpts of the medical record addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the medical record is incorporated herein by reference.

hemangioma[4] at L2, but "[i]nterval disc appear . . . [to be ] . . . well maintained." (Doc. 14, p. 258) Plaintiff followed up with Dr. J. Lee Copeland, M.D., his primary care physician, the next day, complaining of back pain. (Doc. 14, p. 257)

Plaintiff presented to the Cookeville Regional Medical Center (Cookeville Regional) ER for hypertension and chest pain on December 16, 2007. (Doc. 14, pp. 320-25) He was admitted for observation, "underwent cardiac stress testing," and "[m]inor disease was found."[5] (Doc. 14, p. 320) Dr. Robert Case, M.D., evaluated plaintiff the next day. (Doc. 14, pp. 623-26) Dr. Case noted that "[c]ardiac catheterization appear[ed] to be indicated . . . ." (Doc. 14, p. 626), and on December 18th he performed a left heart catheterization, left ventriculography,[6] selective coronary angiography,[7] and renal[8] artery angiography. (Doc. 14, pp. 631-32) Minimal/no significant disease was found. (Doc. 14, p. 631)

Plaintiff presented to Dr. Copeland on November 13, 2009 for high blood pressure, which Dr. Copeland noted had "been running normal," and "a form to be filled out stating that he [wa]s able to go to work." (Doc. 14, pp. 268-69) Plaintiff was in no acute distress, denied any neurological issues, *i.e.*, tingling or numbness, etc., and his physical examination was normal. Dr.

---

[4] Hemangioma – "a common type of vascular formation . . . consisting of newly formed blood vessels . . . ." *Dorland's Illustrated Medical Dictionary* 831 (32nd ed. 2012).

[5] Plaintiff admitted on admission that he smoked two packs of cigarettes a day, and drank "[a] case of Bud Lite daily." References to plaintiff's excessive drinking and smoking over the years, as well as advice by the many physicians who treated him over the years to quit, appear repeatedly throughout the medical evidence of record. Except to note here that plaintiff drank and smoked excessively for years against the advice of his doctors, plaintiff's excessive drinking and smoking will not be mentioned again.

[6] Ventriculography – "radiography of the head following removal of cerebrospinal fluid from the cerebral ventricles and its replacement by air or other contrast medium . . . ." *Dorland's* at 2048.

[7] Angiography – "the radiographic visualization of blood vessels . . . ." *Dorland's* at 84.

[8] Renal – "pertaining to the kidney . . . ." *Dorland's* at 1623.

Copeland released plaintiff "to work [without] restrictions," noting that plaintiff had "recovered & has had no further problems" since the 2006 4-wheeler accident. (Doc. 14, p. 270)

Dr. Marilyn Vermeesch, M.D., treated plaintiff repeatedly between January 2010 and August 2012. (Doc. 14, pp. 273-76, 279-85, 287-90, 292-95, 297-99, 440-45, 491-94, 497-98) Plaintiff's many examinations were unremarkable, with plaintiff repeatedly denying any negative system-related symptoms, *i.e.*, constitutional, head, eyes, ears, nose, throat, cardiovascular, respiratory, gastrointestinal, neurological, musculoskeletal, psychiatric, etc. Actual physical examination consistently showed plaintiff in no acute distress, and – where an issue – he exhibited normal cardiovascular functioning, no musculoskeletal instability or tenderness to palpation, normal musculoskeletal range of motion (ROM), upper extremity strength 4-5-/5 bilaterally, lower extremity strength 5/5, symmetrical/normal deep tendon responses (DTRs), and normal gait.

Dr. Donita Keown, M.D., examined plaintiff consultively on July 19, 2011 to check the lower spine ROM, straight-leg raises, gait and station. (Doc. 14, pp. 390-91) Dr. Keown recorded the following impressions following the examination:

> . . . . Mr. Mabry ambulated without difficulty through the parking area. He ambulates antalgically[9] in the exam room and does not provide reliable effort for range of motion testing.
>
> . . .
>
> Thoracolumbar[10] Column: No asymmetry. No spasm. He is carrying a worn out back brace, which he states he uses daily. His posterior thorax and lower back are darkly suntanned. There are no tan lines whe[re] wearing a brace. He does not provide reliable effort

---

[9] Antalgic – ". . . a posture or gait assumed . . . to lessen pain." *Dorland's* at 97.

[10] Thoracolumbar – "pertaining to the thoracic and lumbar parts of the spine." *Dorland's* at 1920.

to dorsiflexion,[11] extension, or lateral flexion. The straight leg raise maneuvers are negative bilaterally. He is not cooperative for DTRs. The claimant exhibits normal straightaway walk outside of the clinic, antalgic ambulation pattern in the exam room. He does not cooperate for the parts of gait and station evaluation. He does not use nor . . . require[] an assistive device.

(Doc. 14, p. 391)

Dr. Lina Caldwell, M.D. completed a DDS medical consultant analysis on August 10, 2011. (Doc. 14, pp. 400-04) Dr. Caldwell determined that plaintiff had no severe impairments, either singly or in combination. (Doc. 14, p. 400) Dr. Caldwell recorded the following observations relevant to this inquiry:

Broken back and hypertension fail to impose any functional limitations. LS [lumbosacral] 4/23/06 [xrays of plaintiff's lumbar spine following the 4-wheeler accident] showed anterior wedging of T12 and L1 c/w [consistent with] compression fractures, age indeterminate. OV [office visit] 7/19/11 [Dr. Keown's consultive examination] noted no document[ed] functional limitations. He does not cooperate for parts of gait and station evaluation, walks with antalgic gait.

Hypertension no end organ sequelae[12] to preclude nonsevere sGA [substantial gainful activity].

Credibility: Symptoms of SSA 3373 are not credible. No documented convincing MDI [medically determinable impairments] to support he can only lift less than 10 lbs, is limited in squatting, bending, standing, reaching, kneeling or that he can only walk 5 minutes or so. The symptoms are not credible. The alleged severity and impact on function are inconsistent and disproportionate to the expected and demonstrated severity based on longitudinal evidence.

MSS [medical source statement]: 11/13/09 [Dr. Copeland's report] released to work without restrictions. "Noted? Lumbar fx [fractures]

---

[11] Dorsiflexion – "flexion or bending toward the extensor [any muscle that extends a joint] aspect of a limb . . . ." *Dorland's* at 563, 663.

[12] Sequelae – "any lesion or affection following or caused by an attack of disease." *Dorland's* at 1696.

approximately 2006, suffered ant[erior] wedge fractures in 2006, he recovered and has had no further problems".

FO [follow on] observed no problems standing, walking, etc. 5/23/11 [appointment with Dr. Copeland for reaction to blood pressure medication].

(Doc. 14, p. 403)

Plaintiff presented to the Cumberland River Hospital ER on September 23, 2011 for a severe headache. (Doc. 14, pp. 407-14) The ER doctor, Dr. Mark Clapp, M.D., noted: "[s]ome chronic back pain – trying to get disability." (Doc. 14, p. 407) CT scan of plaintiff's cervical spine revealed the following: "no evidence of acute fracture or subluxation"[13]; "mild degenerative changes" of the cervical spine "with some anterior osteophyte[14] formation and perhaps mild loss of disc space height at C4- 5 and C5-6; there appeared "[t]o be a broad disc bulge at C5-6 resulting in at least moderate narrowing of the central canal with AP canal diameter of 7 mm." (Doc. 14, p. 409) The impression from an accompanying CT scan of plaintiff's head was "[a]cute maxillary sinusitis[15] otherwise [an] unremarkable exam." (Doc. 14, p. 410)

Dr. Vermeesch ordered MRIs of plaintiff's cervical and lumbar spine on October 11, 2011 (Doc. 14, p. 443) following plaintiff's complaint of numbness and pain that date, and the month before (Doc. 14, pp. 435-39, 440-45). The impression in the report of the MRI of plaintiff's lumbar spine performed on October 17, 2011 was as follows:

1    Disc degeneration at the L5-S1 level with a moderate sized

---

[13]   Subluxation – "an incomplete or partial dislocation . . . a vertebral displacement believed to impair nerve function." *Dorland's* at 1791.

[14]   Osteophyte – "a bony excrescence [abnormal outgrowth] of osseous [bony] outgrowth . . . ." *Dorland's* at 657, 1343, 1348.

[15]   Maxillary sinusitis – "inflammation of a sinus [cavity, channel, or space], usually a paranasal [along side or near the nose] sinus . . . ." *Dorland's* at 1379, 1722.

right paracentral disc extrusion with caudal[16] migration causing severe right lateral recess stenosis,[17] moderate effacement of thecal[18] sac on the right and compressing the right L5 nerve root within the lateral recess[.]

2    Disc degeneration at the L4-5 level with an annular[19] bulge and superimposed left paracentral broad-based disc protrusion with left lateral recess stenosis putting at risk the left S1 nerve root[.] There is also right lateral recess stenosis to a lesser extent[.] Of note is the presence of a moderate to severe right sided foraminal[20] narrowing compression/putting at risk the right L5 nerve root within the neural foramen[.]

3    Mild superior endplate compression fracture of L1 and minimal at T-12 are old with no retropulsed[21] fragment[.]

4    Vertebral body hemangioma at L2[.]

5    18 mm left adrenal gland mass/nodule is indeterminate in nature by this exam though likely adrenal adenoma[.][22] Further evaluation can be accomplished as mentioned above[.]

(Doc. 14, p. 418)  The impression from the MRI of plaintiff's cervical spine included the following:

"C5-C6 subligamentous central disc herniation leading to moderate central canal stenosis, moderate cord compression without cord deformity, significantly abnormal elevated T2 signal within the cord

---

16  Caudal – "pertaining to the . . . tail . . . ." *Dorland's* at 308.

17  Stenosis – "an abnormal narrowing of a duct or canal . . . ." *Dorland's* at 1769.

18  Theca – "an enclosing case or sheath . . . ." *Dorland's* at 1908.

19  Annular – "shaped like a ring." *Dorland's* at 94.

20  Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's* at 729.

21  Retropulse – "a driving back." *Dorland's* at 1636.

22  Adrenal – "pertaining to either of two glands located just above the kidneys . . . ." *Dorland's* at 32. Adenoma – "a benign epithelial [the covering of internal and external surfaces of the body] tumor . . . ." *Dorland's* at 28, 637.

at this level." (Doc. 14, p. 438)

Neurosurgeon Dr. Leonardo Rodriguez-Cruz, M.D., examined plaintiff on November 16, 2011 on referral from Dr. Vermeesch. (Doc. 14, pp. 446-49) Based on the MRIs that Dr. Vermeesch had ordered, Dr. Rodriguez-Cruz assessed plaintiff with a herniated disc at C5-6 with myelopathy,[23] lumbago, and displacement of lumbar intervertebral disc. (Doc. 14, p. 448) Dr. Rodriguez-Cruz performed surgery to resolve these issues on December 2, 2011. (Doc. 14, pp. 453-55)

Plaintiff reported to Dr. Rodriguez-Cruz with low back pain on January 6, 2012. (Doc. 14, p. 462) Dr. Rodriguez-Cruz wrote a letter to Dr. Vermeesch that same day noting that plaintiff reports "his preoperative symptoms have improved," his "neurological exam is gradually improving," cervical spine xrays "revealed a stable fusion," plaintiff "may return to work soon, but we will discuss it further at the next office visit." (Doc. 14, p. 462) Dr. Rodriguez-Cruz also ordered a myelogram and lumbar CT scan, which were performed on January 12, 2012. (Doc. 14, pp. 456-62) The myelogram revealed a herniated disc at L4-5 on the right. (Doc. 14, pp. 460-61) A post-myelogram CT scan revealed a "mild annular bulge at the L3-4 level," "[v]ertebral body hemangioma at L2," "[s]table endplate compression fracture of L1 which is mild and old." (Doc. 14, pp. 457-59)

Plaintiff returned to see Dr. Rodriguez-Cruz on January 23, 2012 complaining of "gradually worsening" low back pain. (Doc. 14, pp. 463-65) Plaintiff reported his pain as 3-6/10, but he was in no acute distress at the time, paraspinal musculature was nontender to palpation, spinal ROM was normal, straight leg rise was positive on the right, strength was 5/5 in all extremities except the

---

[23] Myelopathy – "one of various functional disturbances or pathological changes in the spinal cord . . . ." *Dorland's* at 1220.

anterior tibialis,[24] which was 4/5, his gait was normal, and he was able to stand without difficulty. Imaging of plaintiff's low back on January 31, 2012 revealed: "a cannula[25] overlying the posterior elements off to one side at the L4-L5 level." (Doc. 14, pp. 571-72)  Dr. Rodriguez-Cruz performed a right L4-5 METRx microdiskectomy[26] to resolve the herniated disc at L4-5. (Doc. 14, pp. 475-77)

Plaintiff was a walk-in to the Cookeville Regional ER on at 11:49 p.m. on February 4, 2012 complaining of severe lower back pain. (Doc. 14, pp. 547-63)  He was discharged to home at 2:10 a.m. on February 5th with instructions to followup with his primary care physician on Monday. (Doc. 14, p. 557)  The record shows that plaintiff did not followup with Dr. Vermeesch until February 24, 2012, at which time he represented that his neck felt better, but not his lower back. (Doc. 14, p. 493)  Plaintiff "admit[ted] he ha[d] been overdoing it since surgery with working on cars and other things." (Doc. 14, p. 493)

Dr. Rodriguez-Cruz wrote a letter to Dr. Vermeesch on February 27, 2012 in which he noted that plaintiff's preoperative symptoms had improved since the L4-5 microdiskectomy on January 31, 2012, but that he has since developed "weakness and right hip pain." (Doc. 14, p. 480)  Dr. Rodriguez-Cruz also noted that plaintiff's "neurological exam is gradually improving," and again that he "may return to work soon . . . ."

Plaintiff was treated on March 26, 2012 by Dr. Rodriguez-Cruz whose progress note reports that plaintiff had developed neck pain. (Doc. 14, pp. 481-83)  Dr. Rodriguez-Cruz noted further that the musculature of plaintiff's thoracic and lumbosacral spine was nontender to palpation, ROM was

---

[24] Tibialis – "tibial [shin bone]." *Dorland's* at 1927.

[25] Cannula – "a tube for insertion into a vessel, duct, or cavity . . . ." *Dorland's* at 281.

[26] Microdiskectomy – "debulking [removal of a major portion of . . . material] of a herniated nucleus pulposus [the inner gel-like center of a disc] using an operating microscope or loupe for magnification . . . performed with instruments introduced . . . through an arthroscope." *Dorland's* at 473, 546, 1158.

normal, his strength was normal in his lower extremities, his gait was normal, and he was able to stand without difficulty. Dr. Rodriguez-Cruz concluded by noting: "Doing well. Symptoms resolved. Follow-up as needed. I have recommended that [he] see a chiropractor for his neck pain."

Plaintiff reported to Dr. Vermeesch on April 9, 2012 that he had been experiencing dizziness and blurry vision for 2 weeks. (Doc. 14, pp. 497-98) Dr. Vermeesch noted that Dr. Rodriguez-Cruz had cleared plaintiff to return to work, that plaintiff was "working in construction and looking up a lot," that plaintiff had not experienced these symptoms until after he returned to work, and that plaintiff believed the symptoms might be related to "being hot when out in the sun." (Doc. 14, p. 497)

Plaintiff arrived by ambulance to the Cookeville Regional ER at 9:45 p.m. on June 24, 2012 complaining of headaches "the past couple weeks," describing the headache pain as "moderate" "at its worst," and dizziness for the past 2-3 days. (Doc. 14, pp. 528-46) Plaintiff's neurological examination was normal, and his strength "5/5 in all extremities." (Doc. 14, p. 535). A CT scan was made of plaintiff's head with the following impression noted:

> 1. Ill-defined area of low attenuation in the left cerebellum may represent severe ischemic[27] changes or infraction[28] of indeterminate age. Less likely, this could be artifactual[29] or due to edema from an underlying mass lesion cannot be excluded. MRI may be useful for further evaluation.

---

[27] Ischemia – "deficiency of blood in a part, usually due to a functional constriction or actual obstruction of a blood vessel." *Dorland's* at 961.

[28] Infarction – "an ischemic condition of the brain, producing local tissue death and usually a persistent focal neurological deficit in the area of distribution of one of the cerebral arteries." *Dorland's* at 934.

[29] Artifact – "In radiology, a substance or structure not naturally present in living tissue, but of which an authentic image appears in a radiograph." *Dorland's* at 161.

2. Remote lacunar[30] infarction in the left basal ganglia.[31]

(Doc. 14, p. 545) Plaintiff was discharged to home at 12:12 a.m. the following morning; however, he was notified at 10:15 a.m. that same morning to return to the ER for a MRI.

Plaintiff returned to the Cookeville Regional ER on June 25, 2012. (Doc. 14, pp. 510-27) The impression reported from the MRI was: late acute or subacute stroke of the left cerebellum; old lacunar stroke of the left cerebellar hemisphere; old lacunar stroke of the left basal ganglia; patchy heterogenous regions of abnormal signal within the cerebellar hemisphere bilaterally; likely chronic possibly sequela of old ischemic injury . . . exact etiology[32] . . . not certain; no masslike or abnormally enhancing lesions; mild atrophy; chronic right maxillary sinus disease. (Doc. 14, p. 527) Plaintiff was diagnosed with "apparent acute to sub acute CVA[33] . . . but refus[ed] to stay . . . ." at the hospital against medical advice. (Doc. 14, p. 517)

Plaintiff followed up with Dr. Crystal Martin, M.D., on July 3, 2012, following his MRI on June 25th. (Doc. 14, pp. 663-66) Dr. Martin noted that plaintiff ambulated without difficulty, although he exhibited a "mild antalgic" gait, he had full ROM and flexion bilaterally, strength 4-5/5 bilaterally, i.e., strength "mildly decreased" in the upper extremities but 5/5 in the lower extremities. (Doc. 14, pp. 664-65)

Plaintiff presented to ophthalmologist Dr. Grisolano, M.D., on July 5, 2012 on referral from Dr. Martin to assess the residual effect of plaintiff's stroke on his visual acuity. (Doc. 14, pp. 781-83) The examination revealed that the right eye was "normal," and "very minimal temporal changes

---

30  Lacuna – "a small pit or hollow cavity . . . between other body structures." *Dorland's* at 998.

31  Basal – "pertaining to or situated near a base" *Dorland's* at 201. Ganglia – "a group of nerve cell bodies . . . applied to certain nuclear groups within the brain." *Dorland's* at 757.

32  Etiology – "the causes or origin of a disease or disorder." *Dorland's* at 652.

33  CVA – "cerebrovascular accident." *Dorland's* at 2111.

from [the] cva" in the left eye. (Doc. 14, p. 782)

Plaintiff was taken by ambulance to the Cookeville Regional ER on August 13, 2012 with two episodes of "[i]ntractable dizziness. . . for 12 hours." (Doc. 14, pp. 670-723) Examination revealed "mild left-sided weakness." (Doc. 14, p. 674) Imaging was summarized as follows:

> MRA[34] brain showed occluded proximal third of basilar artery, no flow identified within the distal right and left vertebral arteries. . . . MRI brain – acute infarct in the left pons,[35] late acute in nature, likely late subacute to early chronic in the left brachium[36] pontis. . . . CT head – old infarcts with mild atrophy, no acute intracranial process, right maxillary ethmoid[37] sinus disease.

(Doc. 14, p. 670) Given the "acute CVA findings and occlusion of the basilar artery," plaintiff was transferred to Erlanger Medical Center (Erlanger) the following day, August 14, 2012 where he was hospitalized. (Doc. 14, pp. 724-77)

Dr. Charles Joel, M.D., performed a cerebral angiogram at Erlanger on August 16, 2012 which revealed an occluded basilar artery with a left subclavian[38] occlusion which was stented. (Doc 14 pp. 728-30) Plaintiff improved neurologically following surgery, and he was discharged without further complications on August 17, 2012. (Doc. 14, p. 730)

Plaintiff presented to Dr. Grisolano on August 30, 2012 on referral from Dr. Martin to assess the residual effect of plaintiff's August 17th stroke on his visual acuity. (Doc. 14, pp. 778-80) The

---

[34]  MRA – "magnetic resonance angiography." *Dorland's* at 2118.

[35]  Pons – "the part of the central nervous system lying between the medulla oblongata [nerve tissue that controls vital functions such as respiration, circulation, and special senses] and the mesencephalon [midbrain], ventral to the cerebellum . . . ." *Dorland's* at 1121, 1138, 1459, 2047.

[36]  Brachium – "the part of the upper [arm] from the shoulder to elbow." *Dorland's* at 244.

[37]  Ethmoid – "perforated like a sieve . . . ." *Dorland's* at 651.

[38]  Subclavian – "inferior to the clavicle [collar bone], such as the subclavian artery." *Dorland's* at , 370 1790.

examination revealed that both eyes were "normal" (Doc. 14, p. 779), and plaintiff was instructed to return in one year (Doc. 14, p. 780).

Plaintiff followed up with Dr. Joel on October 15, 2012 who reported that plaintiff "has had no new stroke-type symptoms," "[h]e is undergoing therapy for his previous stroke," "[he] has no acute complaints otherwise," he is in "no distress," he exhibited "[p]reserved motor function of upper and lower extremities," and "he has easily palpable radial artery pulse on the left" with "triphasic[39] flow into the radial artery on the left as well." (Doc. 14, p. 813)

Dr. Joel, in turn, referred plaintiff to Dr. R. Lewis Wilson, M.D., on November 1, 2012 for further evaluation. (Doc. 14, pp. 822-83) Dr. Wilson reported that plaintiff appeared to be in "no acute distress," and there were "no sensory or motor focal deficits except [a] slightly weak left hand." Plaintiff's physical examination was otherwise normal, and a followup appointment was made for April 2, 2013. (Doc. 14, p. 823) The medical record of evidence does not show whether plaintiff kept the April appointment.

Plaintiff presented to Dr. Martin on November 30, 2012 for a "worried left shoulder." (Doc. 14, pp. 784-86) Plaintiff characterized his pain as "mild," and Dr. Martin noted that he exhibited no tenderness to palpation, had unspecified decreased ROM, and only mildly decreased strength. (Doc. 14, p. 785) An xray of plaintiff's left shoulder was unremarkable. (Doc. 14, pp. 798-99)

Plaintiff saw Dr. Martin about his shoulder again on December 4, 2012. (Doc. 14, pp. 788-89) Plaintiff presented with no pain at the time of the examination, but characterized his pain as mild when "manipulated." (Doc. 14, p. 788) Dr. Martin again noted unspecified decrease in ROM, but reported his strength as 5/5 bilaterally. (Doc. 14, pp. 788-89) Plaintiff specifically denied any

_____

[39] Triphasic – "triply varied . . .[a term] used in describing the electromotive actions of muscles." *Dorland's* at 1969.

weakness or decreased grip strength.  (Doc. 14, p. 788)

Plaintiff presented to Dr. Amy Hix, M.D., for dizziness on May 1, 2013.  (Doc. 14, pp. 824-26)  Dr. Hix noted that plaintiff was "in no distress," that his heart and lungs were normal, and that his musculoskeletal exam was normal, *i.e.*, symmetry, tone, strength, ROM, with no tenderness to palpation, and his gait within normal limits.  (Doc. 14, p. 825)

Plaintiff was treated at the Cumberland River Hospital on October 8, 2013.[40]  (Doc. 14, p. 7)  A CT scan of plaintiff's head revealed an "[a]cute hemorrhage which likely originated in the left thalamus[41] with extension into the left lateral ventricle with mild mass effect but no significant midline shift . . . likely hypertensive in origin."  (Doc. 14, p. 10)  Plaintiff was transferred from the Cumberland River Hospital to Erlanger that same day.  (Doc. 14, p. 14)

Plaintiff was examined at Erlanger, where the following neurological observations were made: no facial droop; strength 3-4/5 on the right side, upper and lower extremities; strength 5/5 on the left side, upper and lower extremities; sensation intact.  (Doc. 14, p. 16)  A CT scan and MRI done at Erlanger revealed no significant change in plaintiff's condition from the imaging performed earlier at the Cumberland River Hospital.  (Doc. 14, pp. 19, 22, 25-27-28)  Plaintiff was discharged from Erlanger on October 13, 2013, with a diagnosis that included "[i]ntracranial hemorrhage (left thalamic and basal ganglia with intraventricular[42] extension)."  (Doc. 14, p. 18)

## B.  Hearing[43]

---

[40]  The evidence that follows was submitted to the Appeals Council, but never presented to the ALJ.

[41]  Thalamus – a symmetrical structure lying midline between the cerebral cortex and the midbrain.  *Dorland's* at 1907.

[42]  Intraventricular – "within a ventricle [cavities within the brain . . . filled with cerebrospinal fluid . . . .." *Dorland's* at 954, 2047.

[43]  The excerpts of the transcript of the hearing addressed below are those necessary to support the court's analysis of plaintiff's claims of error.  The remainder of the transcript of the hearing is incorporated herein by reference.

Plaintiff provided the following testimony at the hearing upon questioning by counsel: 1) he abandoned his last attempt to work in 2010 because he "couldn't stand, and [his] hands were numb"; (Doc. 14, p. 73); 2) his inability to stand was due to his back pain going into both legs (Doc. 14, pp. 73-74); 3) he still had problems with numbness in his hands, and still had difficulty picking things up (Doc. 14, pp. 74, 76); 4) he has not had neck pain since Dr. Rodriguez-Cruz operated on him (Doc. 14, p. 74); 5) he experienced lower back pain "[a] little bit every now and then" (Doc. 14, p. 75); 6) he had difficulty sitting for more than 1 hr. (Doc. 14, p. 76); 7) he had no difficulty turning his head from side to side, or moving it up and down (Doc. 14, pp. 76-77); 8) he had difficulty doing housework "[e]very now and then" (Doc. 14, p. 77); 9) he had difficulty buttoning his trousers and tying his shoes because of the numbness in his hands (Doc. 14, pp. 77-78); 10) he no longer was able to drive (Doc. 14, pp. 78-79); 11) before his stroke, his back would hurt if he lifted more than 50 lbs. (Doc. 14, p. 80); 12) he rated his back pain as 6 on a scale from 0 to 10 (Doc. 14, p. 82); 13) before his stroke, he had to lie down "[a]bout twice a week" for "[m]aybe a[n] hour at a time" because of back pain (Doc. 14, p. 84); 14) since his stroke, cannot use his left arm at all (Doc. 14, p. 85); 15) he has had balance problems since his stroke, had fallen "[o]nce or twice," and used a cane "[a]bout every day" (Doc. 14, p. 86); 16) his cousin had to buy his groceries for him (Doc. 14, p. 86); 17) he "scrounge[d] around" and was able to do most of his own housework (Doc. 14, pp. 86-87); 18) he was unable to take care of his yard (Doc. 14, p. 87); 19) his son checked up on him about every two weeks (Doc. 14, p. 87); 20) he was unable to take a shower because he had to sit down due to weakness in his left arm and leg (Doc. 14, p. 88); 21) he was unable to cook his meals on the stove (Doc. 14, p. 90); 22) he stayed home because he was unable to get out (Doc. 14, pp. 90-91).

Plaintiff provided the following additional testimony upon questioning by the ALJ: 1) the heaviest thing he could hold with his left hand was a pencil, although he "might" be able to hold a

half-gallon of milk (Doc. 14, pp. 91-92); 2) he spent his day sitting and watching television because "[t]hat's all [he] can do" (Doc. 14, p. 92).

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### III.  ANALYSIS

### A.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the

conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. In other words, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

### B. Evidence Not Considered by the ALJ

The evidence at issue here, discussed above at p. 14, pertains to the events of October 8-13, 2013 when plaintiff was diagnosed as having had an intracranial hemorrhage. As noted above at p. 14 n. 40, these records were first presented to the Appeals Counsel. The law is well established that federal courts reviewing claims for Social Security benefits may not reverse an ALJ's decision on the basis of evidence first submitted to the Appeals Council. *See Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993); *see also Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 804 (6th Cir. 2003)(citing *Cotton*). In short, the district court may not consider this evidence on judicial review to reverse the ALJ's decision, or to award benefits. Consequently, this evidence will not be considered in the analysis of plaintiff's claims of error.

The next question is whether remand of this evidence for the ALJ to consider is appropriate under the sixth sentence of § 405(g). The sixth sentence of § 405(g) reads in relevant part as follows: "The court may . . . remand the case to the Commissioner of Social Security for further action by the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." Evidence is "new" if it did not exist at the time of the administrative proceeding, "material" if there is a reasonable probability that a different result would have been reached if introduced at the proceeding, and "good cause" is shown if there is "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before

the ALJ." *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).

Evidence such as that at issue is material only if it concerns the plaintiff's condition prior to the ALJ's hearing decision or claimant's DLI. *See Oliver v. Sec'y of HHS*, 804 F.2d 964, 966 (6th Cir. 1986). Medical evidence is not material if it post-dates the DLI and does not pertain to the claimant's conditions/limitations prior to his DLI. *Hogston v. Comm'r of Soc. Sec.*, Slip Copy, 2015 WL 4459352 * 3 (E.D. Mich., July 21, 2015). The medical records at issue here were obtained two and one-half years after plaintiff's DLI, and more than three and one-half months after the ALJ's decision. The evidence at issue also has no bearing on the conditions/limitations alleged during the relevant period. Consequently, this evidence is not material and, as such, remand is not warranted under § 405(g). *See Ferguson*, 628 F.3d at 277-78 (late-developed evidence not material where "it does not . . . speak to plaintiff's condition at the relevant time"); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003)(evidence of subsequent deterioration of condition not material).

## C. Claims of Error

### 1. Whether the ALJ Erred in Evaluating Plaintiff's RFC
### (Doc. 32, pp. 6-12)

Plaintiff offers the following arguments in support of this first claim of error: 1) the ALJ erred in giving great weight to the opinions of Drs. Keown and Caldwell because their opinions were not consistent with subsequent objective spine- and stroke-related medical evidence (Doc. 32, pp. 7-8); 2) no state agency medical consultant evaluated the record after the initial denial; therefore, the ALJ played doctor in evaluating the effect of plaintiff's multiple strokes, herniated cervical and lumbar discs, and residual symptoms of his neck[44] and back surgery (Doc. 32, pp. 7-9); 3) the ALJ

---

[44] As noted above at p. 15, plaintiff testified at the hearing that he had not experienced any neck pain since his surgery, nor did he have any difficulties turning his head left and right, or moving it up and down. Thus to the extent that this claim of error, and those that follow, allege residual problems with respect to plaintiff's neck, such allegations lack an arguable basis in fact, and will not be addressed further.

erred in not obtaining an evaluation by medical professionals of plaintiff's alleged conditions/limitations (Doc. 32, p. 9); 4) the ALJ did not explain the material inconsistencies between plaintiff's testimony and the assessed RFC. (Doc. 32, pp. 9-10).

A claimant's RFC is an assessment of "the most he can do despite his limitations." 20 C.F.R. § 404.1545(a)(1). In making this determination, the ALJ must consider all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8P, 1996 WL 374184 at * 5 (S.S.A.). This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 404.1545(a)(3)

Plaintiff argues first that the ALJ erred in giving great weight to the opinions of Drs. Keown and Caldwell because their opinions were not consistent with subsequent objective spine- and stroke-related medical evidence. (Doc. 32, pp. 7-8) Plaintiff asserts that "the ALJ may have been justified in relying on . . . the[] opinions" of Drs. Keown and Caldwell but for the "additional purely objective medical evidence after these opinions . . . ." (Doc. 32, p. 7)

As an initial matter, the Magistrate Judge notes that, in determining eligibility for benefits, the relevant time period runs from the alleged disability onset date to the DLI, *Watters v. Comm'r of Soc. Sec.*, 530 Fed.Appx. 419, 421 (6th Cir. 2013), in this case April 23, 2006 and March 31, 2011 respectively. Dr. Keown wrote her report on July 19, 2011, and Dr. Caldwell wrote hers on August 10, 2011. Both reports were completed after plaintiff's DLI, which was March 31, 2011. Because the reports of both Dr. Keown and Caldwell pertained to the relevant time period, and because the relevant time period is what is at issue in this case, the ALJ was duty-bound to consider those reports and weigh the opinions of Drs. Keown and Caldwell. The next question is whether the ALJ was required to consider the later spine-related evidence at issue and, if so, whether those later records provided substantial evidence to support the ALJ's RFC.

The later objective spine-related medical evidence to which plaintiff refers is the September-2011 imaging of plaintiff's cervical and lumbar spine, and the two surgeries performed by Dr. Rodriguez-Cruz, discussed above at pp. 6-10.  Although the imaging in September and October revealed that plaintiff had spinal issues that required surgical intervention, Dr. Vermeesch noted a month after Dr. Rodriguez-Cruz performed the second surgery that plaintiff admitted "overdoing it since surgery with working on cars and other things," the inference being that plaintiff's condition/symptoms were not such that he felt it necessary to restrict his activities due to back pain. Thereafter, on February 27, 2012, Dr. Rodriguez-Cruz wrote that plaintiff "may return to work soon" and, on April 9, 2012, Dr. Vermeesch confirmed that Dr. Rodriguez-Cruz had cleared plaintiff toto do so.

The record shows that the ALJ addressed the later spine-related evidence discussed in the paragraph above in his RFC assessment.  (Doc. 14, p. 56)  These later records provide substantial evidence that plaintiff's back-related issues had been resolved surgically, and that plaintiff had been cleared to return to work more than a year before the hearing.  In short, there is nothing in the medical evidence of record, including the later spine-related records, that would have/should have caused the ALJ to assess a more restrictive RFC.

The stroke-related evidence to which plaintiff refers pertains to the imaging in June and August 2012 which led to Dr. Joel stenting an occluded basilar artery, discussed above at pp. 10-14. These events occurred more than a year after the relevant time period, and had nothing to do with any condition/symptom in the relevant time period.  Consequently, these records are not germane to plaintiff's claim for benefits, or relevant to the matter before the court.  However, because the ALJ chose to address these events in his RFC assessment (Doc. 14, pp. 56-57), the Magistrate Judge will do so as well for the sake of completeness.

As discussed above at pp. 11-13, subsequent evidence showed that Dr. Grisolano determined

that the stroke had no effect on plaintiff's visual acuity, and that both of his eyes were normal. Subsequent evidence also reveals that Dr. Joel noted plaintiff had experienced no new stroke symptoms, and that his upper and lower extremity motor functions were intact, and Dr. Wilson noted that plaintiff had "no sensory or motor focal deficits except [a] slightly weak left hand," and that his examination was otherwise normal. In short, there is nothing in the later stroke-related evidence that would have warranted the ALJ to assess a more restrictive RFC.

Plaintiff asserts in his second argument that no state agency medical consultant evaluated the record after his claim had been denied on initial review and, as a consequence, the ALJ played doctor "in an effort to evaluate the impact" plaintiff's stroke and spine-related conditions/symptoms. Turning to the first part of this argument, the record shows that plaintiff's claims were, in fact, "independently reviewed by a physician and disability examiner" upon reconsideration. (Doc. 14, pp. 127-30) The reviewing disability examiner was Charris Malone, and the physician was Dr. Charles Settle, M.D. (Doc. 14, pp. 105-06).

Notwithstanding the foregoing, plaintiff refers to p. 423 in support of this argument. Page 423 is a blank impairment rating form in a multi-page disability worksheet intended to have been completed upon reconsideration. (Doc, 14, pp. 421-28) Although the impairment rating form has not been completed, notes on the following page, *i.e.*, p. 424, are illuminating:

> THE FILE CONTAINS INSUFFICIENT INFORMATION TO ASSESS CLAIMANT'S ALLEGATIONS AT THIS TIME. THE FILE DOES CONTAIN EVIDENCE, HOWEVER IT CANNOT BE FULLY ASSESSED WITHOUT THE ADLS [activities of daily living]. THE CLAIMANT HAS FAILED TO RETURN THE FORMS, DESPITE THEM BEING SENT TWICE. HE ALSO DECLINED AN OPTION TO COMPLETE THE FORM BY PHONE. THIS CLAIM IS NOW INSUFFICIENT. . . . THE FILE LACKS ANY ROM, GAIT DESCRIPTION OR ADLS ON OR BEFORE 09/30/10 MAKING THE EVIDENCE IN FILE INSUFFICIENT.

(Doc. 14, p. 424)(capitalization in the original)  The notes on p. 424 show that the impairment rating form was not completed because plaintiff did not provide the information necessary to complete it – information requested both in writing and by telephone.

In addition to the foregoing, the record shows that plaintiff was represented by attorney Simpson when he sought reconsideration.  (Doc. 14, pp. 120, 122-26)  When a claimant is represented by counsel, the responsibility to develop the record falls to counsel, not the ALJ.  *See Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007).  Error cannot be imputed to the ALJ for counsel's failure to ensure that the record was complete – or for her failure to ensure that her client complied with the state agency's reasonable demands for information/evidence.

Plaintiff asserts in the next part of his second argument that the ALJ played doctor in his RFC determination.  To that end, the record shows that there were two medical source statements before the ALJ at the time he determined plaintiff's RFC.  The first was Dr. Keown's July 19, 2011 report, discussed above at pp. 4-5, in which she all but accused plaintiff of malingering. The second was Dr. Caldwell's August 10, 2011 report, discussed above at pp. 5-6, in which she assessed plaintiff's conditions/limitations in view of the medical evidence of record before her.  Both reports were written subsequent to the relevant period, *i.e.*, plaintiff's April 23, 2006 alleged initial onset date and   plaintiff's March 31, 2011 DLI, and both pertained to plaintiff's alleged conditions/limitations during the relevant period of time.  Comparing and contrasting the ALJ's RFC assessment with the reports of Drs. Keown and Caldwell, show that, far from playing doctor, the ALJ's RFC assessment tracks those two reports.  Moreover, as shown in the analysis above, the ALJ's RFC assessment is supported by the record both during and after the relevant period.

Plaintiff asserts in his third argument that the ALJ erred in not obtaining a formal evaluation of plaintiff's alleged conditions/limitations.  As discussed above at p. 22, plaintiff was represented by counsel. It was counsel's responsibility to obtain formal medical evaluations of plaintiff's

conditions/limitations, not the ALJ's.

Plaintiff cites SSR 96-8P in support of his final argument that "the ALJ did not explain the material inconsistencies between [his] testimony and the assessed residual functional capacity." (Doc. 32, p. 9)  In deciding a claimant's RFC, the ALJ considers numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's statements about what he is able to do.  *See* 20 C.F.R. § 404.1545(a)(3); SSR 96-5p, 1996 WL 374183 at * 3; SSR 96-8p, 1996 WL 374184 at * 5.  However, the ALJ is required to incorporate into the RFC only those limitations he accepts as credible. *See Irvin v. Soc. Sec. Admin.*, 573 Fed.Appx. 498, 502 (6th Cir. 2014)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Finally, where the ALJ's RFC determination is "supported by substantial evidence," that determination "cannot be set aside under 42 U.S.C. § 405(g)." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

The ALJ's decision shows that he conducted an in depth review of the medical evidence of record in the RFC assessment, evidence that applied both to the relevant period and after.  (Doc. 14, pp. 54-57)  The ALJ also considered plaintiff's testimony in the RFC assessment (Doc. 14, pp. 55, 57), although he did not address specific inconsistencies.  That said, the ALJ did address all of plaintiff's alleged impairments/symptoms and determined that the record did not support the intensity, persistence and limiting effects alleged.  Because the ALJ determined that the medical record of evidence did not support plaintiff's claims of intensity, persistence and limiting effects, and because the ALJ's determination was supported by substantial evidence, any error on the ALJ's part from not doing an inconsistency-by-inconsistency analysis of those inconsistencies to which plaintiff refers is harmless at best.

Plaintiff's first claim of error is without merit for the reasons explained above.

### 2.  Whether the ALJ Erred in Not Identifying All of Plaintiff's

## Severe Impairments at Step Two
### (Doc. 32, pp. 12-14)

Plaintiff argues that the ALJ erred in failing to include the following as severe impairments at step two: hypertension, neck and back disorders, and multiple strokes.[45]  Plaintiff asserts he is aware that an ALJ's failure to list all severe impairments at step two generally constitutes harmless error.  He argues instead that, by failing to identify all of his severe impairments at step two, "the ALJ did not properly weight the medical evidence and evaluate the functional limitations attendant to those limits."  (Doc. 32, p. 13)

The record shows that the ALJ did, in fact, consider each and every one of the additional impairments at issue in his RFC analysis.  (Doc. 55-56)  The ALJ's analysis of these additional impairments took into consideration the medical evidence of record with respect to these additional impairments, both during and after the relevant period of time, and his assessment was supported by substantial evidence as already discussed.  (Doc. 57)  Plaintiff's second claim or error is without merit.

## 3. Whether the ALJ Improperly Evaluated
### Plaintiff's Credibility
### (Doc. 32, pp. 14-16)

Plaintiff argues in his third claim of error that the ALJ improperly evaluated his credibility because the ALJ's reliance on the opinions of Drs. Keown and Caldwell was "misplaced" "given the voluminous documentation of [plaintiff's] impairments after that date," and that the ALJ "cherry-picked the medical evidence he believed supported his conclusion and failed to properly consider evidence inconsistent with that conclusion."

---

[45]  As previously discussed, plaintiff suffered a stroke on June 25, 2012 following which a left subclavian occlusion was stented on August 16, 2012.  Although imaging on June 25th and August 16th revealed several other abnormalities of unknown age and origin, plaintiff suffered only a single stroke on June 25th, not several strokes as he appears to argue.

The ALJ is required to "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*, 486 F.3d 234, 248 (6th Cir. 2007)(quoting Social Security Ruling 96–7p, 1996 WL 374186, at *2 (SSA)). SSR 96–7p describes a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms. SSR 96–7p, 1996 WL 374186 at * 3 (SSA). "[A]n ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm's of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). The record shows that the ALJ complied with the requirements of SSR 96-7p in his credibility determination.

The ALJ did, in fact, accord great weight to the opinions of Drs. Keown and Caldwell. However, the ALJ did not rely solely on their opinions in his credibility analysis. The record shows that the ALJ engaged in a thorough and thoughtful analysis of all of plaintiff's impairments based on the medical evidence of record, that he compared and contrasted the alleged intensity, persistence, and limiting effects of plaintiff's condition/symptoms in the context of those records and plaintiff's testimony, and that his assessment of plaintiff's credibility – or the lack thereof – was supported by substantial evidence.

As for plaintiff's claim that there is "voluminous documentation of [plaintiff's] impairments after that date," *i.e.*, after the opinions of Drs. Keown and Caldwell, substantial evidence within that body of evidence supports the ALJ's conclusion that plaintiff 's claims of intensity, persistence, and limiting effects due to his conditions/symptoms were not credible. More particularly, plaintiff

argues that objective medical evidence pertaining to his back constitutes such evidence. However, plaintiff disregards the fact, as discussed above at pp. 8-10, that those issues were resolved surgically, after which he was cleared to return to work. The same can be said about plaintiff's claim that medical evidence pertaining to his "multiple strokes" constitutes evidence of his credibility. Again, not true! As discussed above at pp. 10-14, the evidence pertaining to plaintiff's 2012 stroke shows that the stroke left him – at worst – with a "slightly weak left hand," a limitation accounted for in the RFC assessment.

Plaintiff argues next that the ALJ was "mistaken in reporting [plaintiff] alleged he performed no daily activities." The ALJ stated the following in his decision: "Although he alleged he performed no daily activities, the undersigned finds such assertions incredible and not supported by the medical evidence that does not show such sever limitations." (Doc. 14, p. 57)

ADLs refer to "the basic tasks of everyday life such as eating, bathing, dressing, toileting, and transferring." *See Hines v. Colvin*, Slip Copy, 2015 WL 4355978 n. 2 (W.D. Ky. July 14, 2015)(citation omitted). The portion of the transcript of the hearing, summarized above at pp. 15-16, show that plaintiff was unable to cook his meals, he was unable to shower, he had difficulty buttoning his trousers and tying his shoes, he was unable to drive, his cousin had to buy his groceries for him, and he had to stay home because he was unable to go out. The ALJ's assessment that plaintiff "alleged he performed no daily activities" is a fair characterization of plaintiff's testimony as to his ADLs.

Finally, plaintiff alleges that "the ALJ cherry-picked the medical evidence he believed supported his conclusion and failed to properly consider evidence inconsistent with that conclusion." (Doc. 14, p. 15) Plaintiff fails to provide any examples of how the ALJ cherry-picked the medical evidence to support conclusion, or evidence that was inconsistent with his credibility assessment. The district court is not obligated on judicial review to supply factual allegations in support of

claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, this argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").[46] Plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred in Finding that Plaintiff Was Able to Perform Jobs Identified by the VE (Doc. 32, p. 16)

Plaintiff asserts that his final claim of error "follows from the ALJ's failure to properly weigh the medical evidence." He goes on to link this claim of error to "the ALJ's assessment of [his] residual functional capacity," and that his previous argument is "equally compelling in support of the proposition that the ALJ's finding that [plaintiff] can perform jobs identified by the VE is not supported by substantial evidence." As previously discussed above at pp. 18-24, the ALJ's RFC assessment was supported by substantial evidence, *i.e.*, it was not in error. Because the ALJ did not err in his RFC analysis, the VE's testimony in the context of that RFC analysis also was not in error. Consequently, plaintiff's fourth claim of error is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's amended motion for judgment on the administrative record (Doc. 31) be **DENIED**, the Commissioner's decision **AFFIRMED**, and plaintiff's original *pro se* motion for judgment on the administrative

---

[46] In any event, the Magistrate Judge's own painstaking, page-by-page review of the medical record discussed herein fully supports the ALJ's conclusion that the intensity, persistence and limiting effects of the impairments alleged simply were not credible, and that the ALJ's credibility assessment was spot on.

record (Doc. 18) be **TERMINATED AS MOOT**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

      **ENTERED** this 18th day of February, 2016.

                                /s/ Joe B. Brown

                                Joe B. Brown

                                United States Magistrate Judge